**In the Interest of Simone LIPSCHITZ, a Child, Shirley S. Schwartz, Natural Mother, Appellant,**

v.

**Ralph L. SMITH, Juvenile Officer for St. Louis County, Respondent.**

No. 33606.

St. Louis Court of Appeals, Missouri.

Sept. 24, 1970.

Motion for Modification or for Rehearing Denied Oct. 19, 1970.

------♦------

Milton W. Schaeffer, Clayton, Frank Mashak, Morton L. Schwartz, St. Louis, Harold E. Scheppner, Jr., Webster Groves, for appellant.

Homer N. Mastorakos, A. Robert Belscher, St. Louis, Corinne R. Goodman, Clayton, for respondent.

LYON ANDERSON, Special Commissioner.

This is an appeal from a judgment rendered by the juvenile court of St. Louis County. The petition in said cause was filed September 17, 1968, by Ralph L. Smith, the acting Juvenile Officer of said court. The petition alleged that Simone Lipschitz, age 14, was "without proper care, custody and treatment in accordance with a written report contained in the Court records." Simone at that time was in the custody of her mother, Mrs. Morton L. Schwartz, under a divorce decree entered June 21, 1958, in an action between Mrs. Schwartz and her husband, Aaron Lipschitz.

On December 9, 1968 testimony was taken in said cause after which the court made a finding that the child was subject to the jurisdiction of the court, and ordered temporary custody to the mother subject to supervision by the juvenile officer, Susan Perry, and that the St. Louis County Welfare Services make an investigation of the home of the mother and the father, Aaron Lipschitz, and file a report with the court within 45 days; all sub-

ject to the continuing jurisdiction of the court.

Further hearings were had in April and May, 1969, and on June 30, 1969 the court rendered its judgment which appears in the transcript as follows:

"1. The custody of the child, Simone Lipschitz, is this date transferred to her father, Aaron Lipschitz.

"2. The child is to be supervised during the adjustment period by St. Louis County Child Welfare Services.

"3. Temporary custody in and the right of visitation by the mother is prohibited during the adjustment period and until further order of the Court.

"4. The Court denies the application by the attorney for the mother for attorney's fees."

Mrs. Shirley Schwartz has appealed from said judgment.

Respondent Ralph L. Smith and Aaron Lipschitz have filed a brief in this court. In said brief it is urged, among other things, that appellant may not contest the jurisdiction of the trial court for the reason that no appeal was taken from the order of December 9, 1968. There is no merit to this contention. The said order was not a final judgment from which an appeal could be taken. It did not make permanent disposition of custody, but left that for future determination after an investigation was made of the homes of the parents and the filing of a report of same with the court. After this was done a final judgment was entered from which this appeal was perfected.

Appellant contends that the trial court was without jurisdiction of the case because it was not a case of neglect within the meaning of the juvenile code, nor was the child charged with a crime or with delinquency, but was an ordinary custody dispute of which the domestic relations court had exclusive jurisdiction, there be-

ing no unusual circumstances or emergency alleged or shown by the evidence.

It cannot be denied that where a petition is filed in the juvenile court charging that a child under the age of 17 is without proper care and treatment the court has jurisdiction to inquire into the validity of such charge. And this is true even though the child is in the custody of one of the parents under a divorce decree and the other parent seeks relief under the juvenile code rather than in the divorce court by way of modification of the decree of divorce. State ex rel. Dubinsky v. Weinstein, Mo., 413 S.W.2d 178. However, it is our view that if the charge is not supported by convincing evidence the juvenile court does not have jurisdiction to award custody, thus depriving the divorce court of its jurisdiction to determine the matter.

In ruling the point urged we review the case as we do suits of an equitable nature. Section 211.171(6), RSMo 1959, V.A.M.S. In doing so we try the case de novo, and consider such competent evidence in the record as we deem admissible and reach our conclusion as to the weight of the evidence without regard to the trial court's finding. Western Cas. & Sur. Co. v. First State Bank of Bonne Terre, Mo. App., 390 S.W.2d 913, 916. In reaching our decision we give due regard to the trial court's opportunity to judge the credibility of the witness, but we must make our own findings and thereafter enter or direct the entry of such judgment as in our opinion justice requires. Schott v. Bruce, Mo.App., 407 S.W.2d 61.

Simone was born September 25, 1954 to Aaron Lipschitz and his wife Shirley (now Mrs. Schwartz). The parents were divorced in July, 1958. By the divorce decree primary custody of Simone was granted to the mother, with temporary custody to the father on alternate weekends and for one summer month. Shirley married Morton L. Schwartz September 9,

1965. They have two children born of this marriage; Judy, born September 6, 1966, and Morton Lawrence, born August 26, 1967. In 1966 Aaron Lipschitz married his present wife, RoseLee, a widow with two children, Nancy and Steven. Nancy is the same age as Simone. Steven, at the time of trial, was less than a month of being nineteen years old. Steven was a student at the University of Missouri at Columbia. Also living in the Lipschitz's home is RoseLee's 62-year-old mother. The Schwartz family live at 12200 Country Lane, Creve Coeur, Missouri. Mrs. Dorothy Hoffman, who made a study of the Schwartz home at the direction of the court, testified that the Schwartz home was " * * * a very luxurious ranch type house. * * * the outside is beautifully landscaped. Inside, the physical setting is very luxurious with wall to wall carpeting, exquisite bathroom. * * * It has a living room, dining room, a large play room, a kitchen with a dining area adjoining it and then a separate room for laundry. It has four bedrooms and it has two and a half baths. It was just purchased for $39,000.00. * * * there is one bedroom set that looks in keeping with the house. Otherwise, the living room, dining room, are empty of furniture and the other rooms are quite sparsely furnished." The witness testified that when she saw the house at some date after December 18, 1968, the Schwartz family had been in it just a few weeks and perhaps had not had time to furnish it. They were living at 8135 Bloom Drive, St. Louis County at the time of the hearing on December 9, 1968.

Doris Gilpin, a psychiatrist who interviewed Simone and her mother on January 18, 1969, was called as a witness by respondent. The purpose of the interview was to make an evaluation of the relationship between Simone and her mother. She considered her evaluation incomplete, but her tentative impression was that Simone was fond of her mother. She found no evidence of serious emotional disturbance

in Simone. She further testified that Simone could exaggerate within normal limits. Her impression of Simone was that she might be a little immature.

The events which led to the filing of the petition occurred in September, 1968. Simone was at her mother's home and had been suffering from a sinus infection. She had returned home from her father's house the night before. She was feeling better and wanted to call her father to inform him of her condition. Her mother refused to permit her to make the call. Simone testified: "I can't remember if she hit me with the phone, she must have because it got me mad * * * I closed the door and put the book shelf in front of it and I opened the window and ran out the window." Mrs. Schwartz testified she did not hit Simone with the telephone.

After climbing through her bedroom window Simone ran to the Quick Shop which is located at Hanley and Page about two blocks from the Schwartz home. This incident occurred about four o'clock in the afternoon. After arriving at the Quick Shop Simone called her stepmother Rose-Lee Lipschitz and requested she come for her. RoseLee responded and arrived about ten minutes after receiving the telephone call. She took Simone in her automobile to the home of one of her friends. Simone was gone from home five days and five nights. During that time she spent the nights at her father's house and the daytime hours at the homes of friends of RoseLee.

Mrs. Schwartz testified that when she called Mr. Lipschitz in an attempt to locate Simone he told her he did not know where the child was, and RoseLee would hang up each time she called the Lipschitz home. RoseLee testified she hung up on Mrs. Schwartz many times.

Upon advice of University City police officers Mr. Lipschitz delivered Simone to the juvenile authorities after he had been served with a writ of habeas corpus. He testified he told Simone that she must go home or to the Detention Home and she chose the latter. She was returned to her mother's home a short time after she was delivered to the juvenile authorities, and remained there until her father obtained her custody under the final decree in this case.

At the time of the first hearing the Schwartz family lived at 8135 Bloom Drive in St. Louis County. At that time Simone was attending the Normandy Junior High School. She made straight B grades and was happy at this school. Her stepfather helped her with her school work. Susan Perry, respondent's witness, when asked if Simone was a bright youngster replied that she was a little above average in that respect. Simone testified she was not doing as well at the Parkway School as she did at Normandy which, she thought, was due to the fact it was a different school and to her thinking about with whom she was going to be placed.

Mrs. Hoffman, respondent's witness, testified that for the last three years Simone's grades have been B or better; above the average. She further testified that Simone's grades had not increased during the last three years. When asked if Simone impressed her as above the average in intelligence, Mrs. Hoffman replied, "Very much so." She stated she felt that Simone was more mature than a great many teenagers. Mrs. Schwartz testified that Simone was on the honor roll at the Normandy school, and her grades at Parkway Junior High were average plus. She stated that Simone was having difficulty with the new math, but after she talked to the school counselor Simone was given extra help. Mr. Schwartz testified they received Simone's grade report from the school; she received an A-minus in math.

Mr. and Mrs. Schwartz are members of Temple Israel. They regularly attend religious services, lectures and allied activities at the Temple. They attend the Friday night services there, and whenever Simone was in the custody of her mother she would go with them. Mrs. Schwartz is

a member of the Jewish Community Center Association. In the summer of 1968 she enrolled Simone as a member of the organization. Since then Simone has attended ten or twelve of the planned activities at the Center. Mr. Schwartz testified that Simone has had a good moral upbringing, and has a very high moral character.

Mrs. Hoffman testified that Simone seemed to be a healthy child. Mrs. Schwartz testified that except for colds and an occasional sinus infection her daughter was in excellent health. Mr. Lipschitz testified that he would not say she was in ill health.

Mrs. Hoffman testified that Simone was well dressed every time she saw her. On one occasion she saw Simone in the Schwartz home. Simone had just come from school. She saw no physical evidence of lack of hygienic care such as washing, dirty fingernails, or bad teeth. Mrs. Perry testified that on the two occasions she talked to Simone the young girl was dressed neatly.

The relationship between Simone and Mr. Schwartz is very good. Simone testified that Mr. Schwartz helps her with her school themes, and treats her fine. She loves the two small children. Mrs. Hoffman testified that Simone "loves everybody concerned and she doesn't really have a great deal of hostility toward anyone."

Many of Simone's complaints against her mother's treatment of her were trivial in nature and could not be said to support the charge in the petition that she was without proper care, custody and treatment. One such incident was a complaint that her mother refused to bring her orange juice when she was suffering from a sinus headache, but told her, "Get your own orange juice." Another was the mother's refusal to let her have a candy bar from the refrigerator, claiming it was for her sister Judy. Simone complained that she was embarrassed by her mother asking her friends who were visiting her to do certain household chores. She fur-

ther testified that her mother called her a whore and a bitch, but had not called her names since she ran away from home. Mrs. Schwartz denied calling Simone a whore or other filthy names, but stated that when provoked she might have called her a snot during the last fourteen years. She further testified that Simone associated with a group of girls who use filthy language. A letter written to Simone from one of these girls was introduced into evidence. It contained a filthy word in referring to Simone's mother. Mr. Lipschitz testified that in a telephone conversation with Simone Mrs. Schwartz, who was on an extension phone, made a nasty remark to him, the substance of which was that since Simone's menstrual periods had started she could engage in sexual acts whenever she wanted to, "and have a little baby for you and nobody will be able to tell the difference."

Simone testified that her mother hit her with a broom, but did not remember when this event occurred. She stated as a result her finger hurt. She gave no details with reference to this event. However, Mr. Schwartz testified that Simone became very angry at her mother and ran out of her room with a broom in her hands toward her mother. Mr. Schwartz attempted to take the broom from her and in the struggle the broom, while being held by Simone, snapped in two. Evidently this was the cause of the injury, if any, of which Simone complained.

At the December 9th hearing Simone testified that before she ran away her mother would strike and slap her because she would sometimes hit the children when they would bite her. She further testified that since the court proceedings started in September, 1968 her mother has not hit her; that since that time things have been pretty good; and that she and her mother have been getting along better since the first part of October.

Simone further testified that she was not happy at home and wanted to live with

her father. It appears from her testimony that the reason for her unhappiness and desire to live with her father was on account of her mother's foul language and the way her mother treated her friends.

At the April 9, 1969 hearing Simone again testified she wanted to live with her father because of the way her mother had treated her. She stated that on one occasion her mother slapped her stating, "You make Judy hate me." Judy at the time was sleeping in Simone's bed. She further testified that since the last hearing her mother had used foul language in her presence, and that if it should be decided that she stay with her mother she probably would get into some really good fights. She testified she thought her mother knew she loves her.

Marian Barnholtz, Supervisor of Domestic Relations Services, and under the law a deputy juvenile officer assigned to the Court of Domestic Relations, was called as a witness for Mrs. Schwartz. She was first directed to make an investigation in 1958 in connection with the divorce proceeding then pending between Mr. Lipschitz and his wife Shirley. She interviewed Mr. Lipschitz, his wife and Simone. At the time of the divorce Simone was placed under the supervision of the juvenile court by Judge Hoester, and Mrs. Barnholtz continued to work on the matter until about 1963 or 1964. She stated that during that period Simone's mother was not uncooperative and did not obstruct her studies or visits in any fashion. During that time Mr. Lipschitz made frequent complaints of mistreatment of Simone by her mother. These complaints were by telephone calls and by letters. She further testified she was unable to verify any physical mistreatment, but a neighbor told her that Simone had been locked out of the house on two occasions as a form of punishment. Simone's mother denied any such action on her part. She stated that she did tell the child to step outside on occasions while she waxed the floors. This was when Simone was three, four or five years old. The child was in a fenced-in yard and would be brought into the house as soon as the waxing process was completed.

Mrs. Barnholtz, when asked her opinion of the relationship between Simone and her mother, replied that she would not say it was good or bad, but it seemed to be pretty average with the usual give and take; that naturally there was no harassment when she was around and that Simone seemed to mind her mother fairly well.

Mrs. Hoffman testified that Simone did not really accuse her mother of physical violence, although Mrs. Schwartz did say she might have pulled her daughter's hair and hit her, but that Simone pulled her hair first. The witness further testified that she thought that as Simone developed and increased in beauty her mother's feeling would become stronger, and there is danger of real physical harm to the child. This speculative opinion by Mrs. Hoffman followed her testimony that she thought Simone's presence was a constant irritant to Mrs. Schwartz and for her own happiness and her ability to be a good mother to the little children Simone has to be out of the home regardless of the treatment accorded her; that if Mrs. Schwartz was the best mother in the world to Simone she thought Simone's presence in the home was detrimental to Mr. and Mrs. Schwartz and the happiness of their marriage.

Miss Perry testified she observed no evidence of physical abuse of Simone but did see signs of emotional neglect. This was demonstrated in her attitude and the way she talked to her. One of these signs was exhibited when she talked to Simone over the telephone the day she was to be enrolled in school. On that occasion Simone had refused to go to school but consented to go after talking to Miss Perry. Miss Perry testified that Simone was almost hysterical when she talked to her that morning and stated that this was

an example of emotional neglect. On another occasion Simone was extremely upset about going to Dr. Gilpin's office, which Miss Perry thought was an example of emotional neglect to a certain extent. Miss Perry did not detail any other incidents which led her to believe that Simone was suffering emotional neglect.

There is a statement in respondent's brief that Miss Perry testifed that Simone told her of dirty conditions which existed in the Schwartz home. We have carefully examined the testimony of the witness and have been unable to find that Miss Perry gave such testimony. Simone testified that she liked her new home and that it was kept clean. Miss Perry testified that Simone complained to her of having to baby-sit with the small children; that her most recent complaint was that after the family moved to Creve Coeur her mother compelled her to baby-sit after she returned from school; that her mother would then go to the old house to clean it, with the result she was unable to do her school homework and her grades were going down. The record does not show how long this practice continued but it seems reasonable that it was temporary. The record further shows that Simone's grades were always above average.

Mrs. Schwartz testified that on occasions she would ask Simone to baby-sit after school for perhaps an hour; that she never asked Simone to baby-sit by herself after nine o'clock in the evening but would have someone to baby-sit with her if they went out after nine o'clock; that this occurred sometimes when they were looking for a new house, and Simone was not opposed to this because she wanted to make extra money. Mrs. Schwartz stated she paid Simone $5.00 per week to baby-sit and at times extra money for such service.

Mrs. Schwartz testified as follows: "Q * * * Within the last three years have you had any physical encounters with Simone in the nature of her hitting you or you hitting her? A There have been a few instances, yes. Q Which way, did she hit you or did you hit her, or both? A She started at me first and I felt that was due to some change in her chemical system and that she couldn't get her way about certain things after talking to her father on the telephone. Q Would you say that Simone has a temper? A Yes. Q Can she control it? A Not always. Like most any other teenager, you know. * * * Q * * * How many times did you and Simone get physically involved? * * * A. I have some marks. I don't know if plastic surgery can take them away but she did not mean to but she has long fingernails and she would lunge at me as a tiger. Naturally, I am a human being; if my husband or any member or anyone would do this, I would have to protect myself. Q (By Mr. Scheppner) Ma'am, just how many times? A More prevalent since my marriage to Mr. Schwartz and upon the birth of my two children. * * * Q How many times? A I would say at the most about five or six. * * * Q * * * You maintain that when you and Simone are arguing that you are always calm and cool other than when you get in these physical fights, * * * ? A I try to because I have a husband and two children to think of."

We have carefully considered and weighed the evidence contained in the transcript in this case and have reached the conclusion that the charge filed by the juvenile officer is not supported by the evidence and that the juvenile court was without jurisdiction to award custody. The court properly denied the motion of appellant for attorney's fees, and except as to this the judgment is reversed without prejudice, however, as to Mr. Lipschitz to seek a modification of the divorce decree if he be so inclined.

PER CURIAM:

The foregoing opinion by LYON ANDERSON, Special Commissioner, is adopted as the opinion of this court. The judg-

ment is reversed except as to the order denying attorney's fees.

WOLFE, P. J., and BRADY and DOWD, JJ., concur.